I would like for the attorneys to step up to the podium. I'd like for the attorneys to tell me their names, who they represent, and approximately how long the argument will take. Good morning, counsel. Good morning, your honors. Hugh Griffin for the defendant appellate, Mercy Hospital and Medical Center. I would appreciate 20 minutes, maybe five, if that's possible. You don't have to appreciate it, we'll give it to you, Mr. Griffin. Good morning, your honors. Michael Razack, I'm here on behalf of the plaintiff's athlete, Joy Jefferson, who is the representative of the estate of Jeanette Turner. I believe 15 minutes should satisfy my needs. Are you going to introduce the other two attorneys? I'm sorry, your honors. Stephen and Scott Lane, who are the trial attorneys for the plaintiff. Okay, cool, Steve. Good morning to you all. Mr. Griffin, you can proceed with your argument. May it please the court. I'm sure your honors are quite aware that this case has two very separate and distinct prongs to it. The first prong is the $15 million in future damages that were awarded to Joy Jefferson as the special representative of the decedent, Jeanette Turner, for her future injuries. The second prong is $7 million plus in past damages also awarded to Ms. Jefferson for Jeanette Turner's past injuries. There's a third prong, if you will, in the sense that there's a wrongful death suit that was filed by Jeanette Turner while this matter was in post-trial motion. That isn't before you today. That cause of action has been stated pending the ultimate appeal. Prong number one, we believe it presents a pure question of law under the Illinois Survival Act. Specifically, what claims can survive in a personal injury suit tried to a jury when the plaintiff dies before the jury returns a verdict? And, as here, a special representative of the estate, Joy Jefferson, was appointed expressly to pursue those claims, quoting their motion, which survive. And that motion was made under 735 IFCS 5-1008B2. But your argument really doesn't have to do with the effect of the appointment of a special administrator. It's just the effect of the plaintiff dying before the jury renders its verdict. Well, that's true. What happens then is you have to have a plaintiff come in or there's no plaintiff. Back in the old days, way before we even had a survival act, if the plaintiff died, the whole action terminated. You couldn't recover for past or you couldn't recover for future. So, now the legislature, to fix that, enacted the Survival Act and the Wrongful Death Act. As far as what can be recovered in a survival action, it's undisputed. Parties don't even dispute that. A survival action allows for recovery of damages sustained by the deceased up to the time of death. That's according to the Supreme Court in the Wyness and the Carter case. So, certainly, Joy Jefferson, as the special representative, had the right to pursue a past damages claim, which resulted in a $7 million award. That's prompt two, which we'll get to. You aren't challenging her award of $7 million for past damages? Yeah, we are doing that on more traditional grounds of failure to prove facts and cause a trial error. So, that's a separate piece of the appeal. Okay. But under the Survival Act, there's no question that the special representative has no right to recover future damages. Our position is those future damages abated at Jeanette Turner's death and were extinguished when she died prior to the verdict. And your position is that if she had died a half hour before the jury delivered its verdict, those damages would have abated. If she died a half hour after, they wouldn't have abated, right? That's correct. That is the law that our Supreme Court, in the Tunnell case, has told us, that a case is only right for judgment when the jury verdict is returned. Plaintiff argued below, we need a bright line. Well, that is the bright line. And really, when you think of the equities of the situation, if the verdict comes in a minute after the verdict, then the defendant's on the line for all those future damages and injuries that never will occur, as well as the past. If, as here, the death occurred before the verdict, it's true that the future damages abate, but the defendant still owes the past damages and is exposed, as in this case, to a wrongful death action. Our trial judge disagreed with our position. Judge McWilliams didn't disagree with our position of what the Survival Act allows. She said she found our argument persuasive, but ultimately she said that it wasn't a Survival Act case, that Joy Jefferson was just a stand-in, if you will, that was still Jeanette's case. And we would just respectfully submit that that's a legal impossibility. I mean, Joy Jefferson wasn't a duly appointed special representative in this case under the Survival Act, and she had no standing to be in the case. And you'd be in the old situation of the only plaintiff left would be a deceased person, and then there couldn't be any enforceable judgment or award. But she agreed, Judge McWilliams agreed with you, that she couldn't enter the verdict, the judgment non-pro tempore to a date before the verdict was rendered. Now she did cite our opponent, my esteemed opponent, Mr. Vasek. They cited cases from around the country involving bench trials. And there are a few cases involving bench trials where the courts have said, look, in a bench trial, the court could enter judgment immediately upon submission. I'm sure many cases tried on the bench every day in the daily center, and many decided right then and there, but the court could, for its convenience, delay it, take it under advisement. There are a few cases, and they cited them, where the plaintiff dies while that case is under advisement, or the defendant is, either party. And a couple of the cases have said, we'll enter judgment non-pro tempore on the date the court, the court, the court, the cop likes to say, I'll enter judgment non-pro tempore on the date I got the case. I could have immediately decided it, and I just didn't do so. But the basis of those cases is the delay is attributed to the court and not to any of the litigants, correct? Right, that's one basis of it. But the key, the real key is the case was right for judgment at the time the court got it. Could have decided it, no legal impediment to deciding it. On no case, I don't think Illinois has ever gone that far. Even in a bench trial, we cite inlaid marriage of Davies. That was a case where, a divorce case, where the court issued an opinion letter, and said enter judgment, and then the defendant died, I believe, and said, well, we're going to enter judgment on the day I issued that opinion letter. So, none of the cases have gone back, in Illinois, gone back as far as a few of these he cited. None of the cases they cited except the one Mississippi trial court ever awarded future damages. All those cases that are analyzed in our briefs, all of them were crude damages or survival act damages. But no case has ever said you can apply this noot pro toot procedure in a jury verdict. Then Judge McWilliams, when they came in after she ruled in their favor, they came in on an emergency motion to say, Judge, well, you ruled in their favor, don't you want to enter judgment noot pro toot on December 3rd while Jeanette was still alive. And we argued that, and she looked at the cases, and I said, Judge, can you think of how that could ever happen? I mean, could the parties ever come in and say, well, Judge, I know the jury's still out there, but let's have judgment entered today. And she knew that there's just no, I can't find any legal ground that would let me do that. So in our brief, they're kind of asking you to do it, but there's just no ground. The case isn't right for judgment when it's submitted to the jury. The jury can be out a day, two days, a week. There's no power in the court to enter judgment until that verdict is returned. So that's prong one. Again, we believe it requires you to just set aside that $15 million in future damages and the model of that case will be out there. That's the claims being made for after the death on behalf of all the beneficiaries for their claims and their damages arising as a result of it and after the death. So now we do need a point of prong two, which Justice O'Neill asked me is that an issue, and we believe it is a significant issue. There's no substantive legal infirmity to the claim like there is with the future damages, but we believe there's an evidentiary infirmity. There was a dispute among the parties as to what caused the death, what happened. One was the respiratory arrest. Plaintiff's theory was a blood clot brought the trachea to. The defense theory was that somehow, possibly, the sister or even the decision adjusting it to displaced it. But that was based, that argument was based on Dr. Reddy's deposition testimony, and at trial he said, I didn't see him, I mean, I didn't have a clear view of Jeanette and her sister. I did not see them manipulating the two. So the point I want to make is I'm giving the issue up on this JLV argument I'm going to make. I want you to assume it was blocked by the clot. I just want to, because that's the point of saying it was all disputed. The JLV argument we're making asks you to assume with their right that it was blocked by a clot, and their experts said the theory of liability was your nurses didn't call the doctors in enough, or the doctors on their own didn't come in enough. Had they come in, they would have addressed the bleeding that was going on and prevented the clot. That was their theory. But our position, our point of our JLV is everything that was identified in the record as to what someone who was called should be doing was all done. It was all being done or had been done under Dr. Kuhn's order. I mean, there were five things identified in the record that you can do in this kind of a case. You can cauterize the stomacite, and that was done with sodium nitrate. You can pack the dressing, and that was done. This term was on blood thinners, so you stop those. You've got to stop the bleeding in order to prevent the clot. The third thing, and the most important thing that Dr. Kuhn did, is he ordered four units of fresh frozen plasma to help the blood coagulate, and that would stop ultimately the bleeding. You then monitor the vital signs continuously, and everybody agrees, because Nurse David, who was on duty that night, was very attentive and did that. Secondly, she continued the suction and the tracheo. So those are the five things that were identified as to what should be done. So what about, again, Annette's testimony where she says, when Dr. Noyega was in the room, then called Dr. Reddy, the two of them debated which one of them should call Dr. Kuhn because neither one of them really wanted to do it. You don't want to bother the senior guy, and so we're talking about a brain injury that occurs within minutes, can occur within minutes. So if the jury believes that, that Noyega and Reddy were kind of arguing about,  but the point was, couldn't have said if they'd called me, I wouldn't have had anything else to tell you to do. We were doing everything according to the plaintiff. Plaintiff's experts agreed that five steps I just read to you, that complied with the standard of care. So there's two sets of cases out there. We cited one set of them, of course. Plaintiff cites the other, but in their cases, you could say, had you called Dr. Kuhn sooner, had somebody picked up the phone instead of debating who should call him, he would have done X, Y, Z, he would have intervened in this particular way and prevented the outcome. There's nothing like that in this record. That was the whole point. We made a direct a verdict motion on this very point. You've also got the, you know, there was a lot of back and forth about who positioned the trait to, and Dr. Reddy said, when I first tried the ambu bag, there was resistance. Then the anesthesiologist repositioned the trait to, and then when Dr. Kuhn just came, he said it was not in the trachea. Right. That kind of supported our case. So the anesthesiologist that nobody ever identified could have been the one that put the tube against tissue instead of in the trachea. Right. Let me get to Dr. Reddy in a minute, but I guess I just want to sum up this point about the real theory was, you should have a doctor in that room doing something to prevent this. And, again, this was not a Rez Ipsa case. Their experts agreed you could have a catastrophic outcome without anybody's negligence when you're treating a tracheotomy. I could just refer the court to one point in the record, 924, page 146. That's Dr. Kuhn that testified that he tried to fix the bleeding at the stoma, but when he couldn't, he realized it was a diffuse bleed. He couldn't cauterize the whole trachea. So that is why he went to the frozen plasma, and it really was the only remedy anybody ever identified in the record as to how you would stop the bleeding in this case. Now, they did make a last gasp effort, you know, a bottom theory to say, well, okay, we didn't prove that some intervention would have prevented this, but how about Dr. Reddy? He had trouble with the IV bag, but to me that theory kind of fell apart because Dr. Graham admitted that, well, anybody having trouble with an IV bag is going to have to go through a series of steps. It's going to take at least a couple of minutes to get that resolved. And then the testimony was the brain damage, as you mentioned, could have occurred within two or three minutes. So to me that causation theory is just left out there in space as well. So that's the sum and substance of our JMOV argument, that they just never proved causation to the reasonable degree of medical certainty that's required under our law, or at least the findings against the manifest weight of the evidence. We didn't have a series of trial errors that we've urged. So this goes back to the dispute about was it a clot or was it dislodgement? And our point is that we didn't get an interview or a fair trial on the clot issue because there was an abundance of improper evidence on that issue.  She says she believes the violation of the standard of care by the nurses contributed to cause the clot and that resulted in a respiratory arrest. Judge? Well, first of all, that's okay. The nurses' violation of the standard of care caused the clot. I think she's gone too far there. I think her only expertise would allow her to say these nurses violated the standard of care because they didn't call Dr. Greger or they didn't call Dr. Prentice when they should have. I think that's all she wants. Weren't there three or four other experts who said the same thing that you don't object to? Well, they had experts. Again, they were experts as to whether it was a dislodgement or a clot. They did have experts who testified that their view was a clot. But when you analyze their testimony, they were only laying on six notes in the hospital chart, which were all made by people that weren't present at the arrest or at the code. And you made that argument to the jury. You must have made that argument. Well, what I'm just telling you, we didn't get a fair shake on this because on top of it, the nurse, and by the way, I don't think you ought to reverse Judge Gallagher in the Sieff case when he learned of the opponent's success. He said the nurse can't give a causation opinion. But there was a broader hearsay testimony that we laid out in the briefs. You know, an unidentified nurse said she heard that it was a clot. One of our other nurses was asked, didn't you hear that it was a clot? Our life care planner was, all she did was make notes in her life care plan. She didn't testify. And her notes from the chart, and that was put in as evidence that there was a clot. And then the counsel said, well, don't ask the jury to draw a negative inference from that. And we did. And then the other neutral aspect of this is just the taint of the non-existent future damages being submitted to the jury and affecting, we believe, would affect their computation. But you didn't really ask for a mistrial. You didn't want a mistrial just in case the jury was going to rule in favor of Mercy. So I don't understand how the claim that had been presented all along could have tainted the present damages. Well, I mean, first of all, we did make a motion for a mistrial. It was stated for the record. That doesn't make it any less of an objection. It was clear that Judge McWilliams was going to take this. She wanted this jury verdict. She says, I anticipated you were going to make a motion. Let's deal with all these issues in post-trial. Get the jury and get them out of here. So, I mean, I don't think it takes the issue off the table. But, you know, that's our position now. There was a specific award of $2.5 million for disfigurement. Now that was not, that was obviously past and future. So we would say that at least the future damages issue tainted that aspect of the award. Didn't Mercy object to the form that the plaintiff submitted that divided past and future? We did. We did. So how can Mercy advance that issue? Don't forget, at that point, the plaintiff was alive. But the other elements of damages were divided into past and future. And for some reason, Mercy chose to say not this one. That is correct. The last issue I had for you was, and it's one I think our Supreme Court will have to resolve at some point, is if you get a motion to stress damages in a bodily injury case, I submit you don't. I wrote an article on it. It's attached to the first trial motion. You can look at the trials that are being held today. About half of them have it in. Half of them don't. I mean, it's part of pain and suffering and loss of enjoyment of life I would submit. So in sum, we would ask this Court to vacate and set aside the future damages of $15 million as being barred by, as a matter of law. We would ask with respect to the $7 million past award, that that be reversed or remanded for a new trial, or that certain elements at least be reduced or vacated. Thank you. Thank you, Mr. Griffin. Good morning, Your Honors. Good morning, Your Honor. I'm here on behalf of the plaintiff's athlete, Judge Jefferson. I'd like to address, obviously, the point that I think that's the largest key point that both sides recognize, the question of the effect of the plaintiff's death while the jury was out. What the defense here is actually asking this Court to do is to reverse more than 100 years of law that governs this very situation. And as I prepared, I realized the defense does not really hustle, does not really quarrel with Mitchell or with Tynan or with the West case. The defense doesn't really quarrel with the concept that in the best trial, if the plaintiff and the defense submit their case for decision, and then one of the parties dies, and then the decision emerges further down the road, it's okay, it's proper in those situations for the Court to enter the judgment for the plaintiff in its entirety, as is the plaintiff has still survived. What the defense is really telling the Court, and I think this is at least part of their argument, is that a jury trial must be treated differently than a bench trial. And their argument is that when we finish with the bench trial, they say the case is ripe for judgment, but when we finish with the jury trial, it's not ripe for judgment because you need a verdict, a decision of the jury. That's just not accurate. It's not logical. When I finish with the bench trial, judgment's not entered when I finish. As I finish my closing argument, even on my deathbed, even if somebody doesn't say, well, that's how you get judgment for you or against you, it goes to the judge for a decision, just like it goes to the jury for a decision. And there is no, that I can see, any logical reason to distinguish between a bench trial and a jury trial for that reason. There's no other issue out there that would cause for the Court to have a different rule in a jury trial case than a bench trial case. And maybe one way to examine that, the fact that it takes the Court some time to decide whether it's a bench or whether it's a jury, the fact finder has got a great number of things to look at, and this case would serve as a good example. If this case was a bench trial and this case had finished and it went to the Court, I don't know many judges who would say, I know exactly what I want to do on every point. There are a great number of points. There are a great number of damage issues. This jury sure didn't take very long. They did not. And I can explain that, although it doesn't have to do with my point, and that's that the defense in this case put, it's an all-or-nothing gamble. They did the same thing that happened in the Griselle case, the federal court case that the defense cites for another reason. They put everything on their argument that the patient and her sister pulled the straight tooth out. That's a big gamble. They went all-or-nothing on it, and in the Griselle case, the Court there pointed out, in that case they put everything on the plaintiff. They didn't really defend what they did. They just put everything on the plaintiff. And when you lose that, that liability issue disappears pretty quickly, and once the liability issue tanks quickly in that courtroom, all that's left is the damages, which took up their time. The reason I think that the Court wanted to do that in all these cases, besides which it is the English common law, I think Mitchell was the one that said American and English law requires this, and, of course, Illinois has adopted English common law. It's in the statute somewhere. But it provides a breadline rule. It provides predictability. When both parties go in, both parties know what they have to do to move forward with the case. So your breadline is, at the time any case is taken under advisement, whether judge or jury. That is correct. It's right for judgment. And that is correct. And Mr. Griffin's breadline is, in bench trials, it's inherent in the power of the Court to enter an order non pro tonto to the date it should have been entered, whereas in a jury trial, until the jury enters its verdict, what can you do? You can't. You can't do anything in a bench trial until the judge reaches a decision. And when the Court talks about right for judgment, that's the phrase that's been used. But what they really mean is right for a decision. And I draw that in part from the Stone Street case where the Court, that Court used the terms right for judgment and right for decision interchangeably, and I draw that from the Mitchell case where the Supreme Court pointed out at the very end of the opinion, this case was right for submission. So we've got this term right for judgment out there, but everybody has their own ideas about what that means. And when I see cases using it with a little different texture, a little different tenor, that tells me that they're just thinking the case could be decided. Well, it could be decided by the judge quickly or the jury quickly. It could be decided by the judge later or the jury later. Again, if Ms. Jefferson had died before the end of the case, a day earlier, you have no argument. Clearly, clearly. And if she dies immediately afterwards, there is no argument. All we have to look at is this one unusual area where we have this gray area. And if the Court isn't satisfied with the fact that we have this line of bench trial cases, in order to come to a decision here, our supporting point is that it lends predictability. It lends fairness because there's a bright-line rule that stops here. Before we get post-submission events, just like we got here, one of the post-submission events, close to four year post-submission events, the discharged juror, once they got to talk to the discharged juror and found out they were going likely to lose, now we've got events post-submission coloring what's going to happen. That is going to require the trial court to have a further hearing to see what happened there. And this is part of the argument. What if the patient has a minor case? What if this was not a serious case, but in fact she had a stroke related to the accident while the jury was out? The plaintiff would be cut off. The plaintiff doesn't have any choice. So the rule that the hospital is asking for is an asymmetrical rule. It's only going to benefit the defense, not the plaintiff. I presume the response might be the plaintiff. I don't see that because, again, Mr. Griffin concedes if she died ten minutes after the jury rendered its verdict, she gets all her estate, gets all the future damages. I don't see how that particular bright line is necessarily unfair to plaintiffs. Because it requires the court to look at matters between the time of submission and the time that the verdict is rendered. Just as an events trial would require a court in an events trial to look at things that happen between the time the case is submitted and the time that the court reviews the case and finds its decision. So we're going to have the outcome determined by events that happen after submission. And events that happen after submission put one party in the position of, if I think the event after submission hurts me, I'm not going to move for a missed trial. If it helps me, I'm going to move for a missed trial. And that's what gives you asymmetry. If you're in a bench trial situation and you're the attorney for either side and there's a change in status of anything, don't you have an obligation to tell the court what's going on in the case? I don't believe so. No. Once the case is submitted to that judge for a decision, that should end it. I can't say as a lawyer I might not want the court to know what was going on. Interestingly enough, we don't tell the jury what's going on. We do not want the jury to do anything about this. So, yes. My question was about bench trials. So, you don't think a judge would be pretty aggravated if some status changed and you knew about it but you didn't tell anybody else, including the judge, about it before some decision came out? I think personal human nature is such that the judge would be aggravated in a legal sense. No. Our point is that it doesn't matter. So, if it doesn't matter, I don't have a duty. As a matter of fact, if I went and told the judge, and I think I can answer that question, if I went and told the judge after the case was submitted for a decision, my client just had a terrible accident, had something wrong, I think my opponent would come in and say, you're trying to influence the judge's position. But we're not talking about a terrible accident. We're talking about dying. Correct. Which is different than a terrible accident. And it's a more significant change in the status of the plaintiff. So, I understand why you can't tell the jury that. The jury didn't know that. Do you think that the jury – do you think that if this were a bench trial and you told the judge that your argument would be the same? Yes. Logically, it is the same. If we tell the judge – if either side tells the judge something that happened after the case is closed, ready for a decision – Well, not just the judge. The other side, too. If either side goes to – no side's heard the judge. If somebody goes to the judge and reports something, the only reason to do that, I would argue, is probably to look for sympathy. And it's the party who's got something to gain that's going to want to do that. And what your Honor said is true. What the defense really, I think, wants to do, and based upon some of the questions I've heard here, is draw one line where the party dies or the case is off the submission and a different line when something else goes wrong. The plaintiff's injury increases. The plaintiff's injury decreases. A witness recants. It's not unheard of for a witness to recant. A trial judge is no longer on the stand. Anything that you can predict will happen. All those things would now result in a new trial. But a death, for some reason, would be treated differently. And I don't know why you would treat one differently than the other. Part of our argument here is that, interestingly, the hospital doesn't really want a misdraught. It's not asking the court for a misdraught. The court wants to abate the future damages. And that tells me that the court, that the hospital, agrees with Weston and Wilson. We are going to stand on the jury, on the verdict, on the finding of the court, but we don't want all of it. And that's got to be the most unfair thing in the world because if this case had to be retried on damages only, assuredly the presentation by the plaintiff's lawyer would not be the same, and the hospital is aware of that. In this case, this future damage specter hung over the courtroom. But without that, there surely would be a concentration, and this is an unusual case in this regard, on the past history. This woman had a long, very long period of damages before trial. There's a long gap between the malpractice and the death. If somebody's going to retry this case on that, that is going to benefit the plaintiff because they're going to restructure their case. And that may be another reason why the dry line seems to make sense, because you end that. You don't have people making motions after submission on the grounds that I can maneuver something better the next time around. Mr. Graff, to address Mr. Griffin's point, that your evidence is legally insufficient to entitle you to this verdict, I'd be happy to do that, Your Honor. Dr. Graham testified that everybody agreed what the cause of the injury was. It was bleeding from the stoma. There's no doubt about that. Everybody agreed the cure is you cauterize the wound and pack it. Dr. Graham said if you do that, you will stop the bleeding, and if you stop the bleeding, you'll stop the clots, and if you stop the clots, you're not going to have any arrest. Dr. LaVirtue, their expert, I think it's at page 146 in volume 23, said, if you do those things, you won't have a clot and you won't have an arrest. All Dr. LaVirtue disagreed was because it was a clot and not that stick case. But we've got all those people saying that, and you have the six notes. No matter what they were going to do, the hospital was going to do, and they called it no six notes, just coming in the air, six notes by five doctors saying there was a clot and it caused the arrest. That alone would have carried this case to the jury, and that's just simply a question of fact. I know we have other evidentiary questions. I think they pale in significance to the two we've just discussed. If the court has any questions on those, I'd be happy to answer them, but I think we've adequately explored them in our briefs. Basically, our point is the hospital got what it always wanted in this case. It wanted a verdict. It's what it fought for. It didn't want anything else to happen along the way. It didn't turn out as well as they hoped, and now they want to take it away, and to do that, they want the court to draw a line between bench and jury trials. It does not need to be drawn. So for those reasons, we ask that the court affirm. Thank you, Mr. Rafferty. Thank you. I guess the court short and beveled. I thought counsel cited the Griselle case, which is a case we cited. I'm not sure what point he wanted to make. That was a bench trial down in southern Illinois where the plaintiff died while the case was under advisement, and the court said, let's have an administrator appointed. The administrator was appointed, and the court said, well, I'm going to order damages now, but it's only going to be up to the time of death because this is a survival case now. That's our point here. I still don't know exactly what counsel's position is. I didn't hear him ask you to enter a judgment note for a punk on December 3rd. That's what those cases would seem to say. That's what they lead you to in a bench trial. But, again, there's no conceivable way that could happen in a jury trial. They cite a case. It's an old one from McReynolds, 121 U.S. 3rd at 266. The court is, the rule that judgment entered on 4-10th when such action is necessary to save a party from being unjustly prejudiced by the lay or act of the court must be taken with one important restriction, that such an entry is not proper unless the case was in such a condition at the date to which judgment is to relate back that a final judgment could have been entered immediately. And it's just not possible that that can be done here. So, the other points counsel made, I'm not sure what he said about that we're fine with the past damages award. I wasted 15 minutes of your time on a lot of pages of my brief trying to convince you that we're not fine with it and that we do believe that we're entitled to some relief. You're not fine with it on an evidentiary basis in terms of causation, but you're not really contesting the elements of damage that went into $7 million. Except the emotional distress and the disfigurement, we've discussed that. We certainly aren't contesting Joy Jefferson's right to pursue and recover those past damages. We're not contesting that. She had the right to do that, the survival act gave her, those causes of action survived. So, as far as the causation piece that you discussed briefly, he refers to our Dr. Lovertu who said, likely if an ET is called in for this, he's going to be able to stop it and he's going to be able to fix it. That's what he said. And that's true. That's what Dr. Kerman thought was going to happen. All the things that he said and that he prescribed, his claim, which many experts said met the standard of care, everybody expected that would prevent the problem. It didn't here, but again, their own experts said, it can't heal in these catastrophic events and nobody's in it. It just can't heal. Unless the court has any further questions, I think we've covered the piece that we intended to. And we would ask this court again to reverse the future damages award and to consider a reversal or a new trial or a reduction of the past damages award. Thank you, Mr. Renner. Mr. Grissom, Mr. Ratzak, the court would like to thank you for your arguments and your briefs. This matter is going to be taken under advisement and there's going to be a brief recess. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Before we begin, I'd just like to remind everybody that these microphones do not amplify, so I'll ask you to keep your voices up. I'd also like to point out that our third colleague, Justice Hyman, is not with us today, but he will listen to the tape and he's also, of course, read the briefs and the arguments. I'd like the court to call the case, please. Thank you. Counsel, will you both step forward, introduce yourselves, and then we'll begin. My name is Patrick Cassidy for Corey Anderson. Matthew Connors on behalf of the people. Thank you. Apollon, if you'd like to begin, please. May it please be clear, Counsel, again, my name is Patrick Cassidy for the appellant, Corey Anderson. Your Honor, as you know, we raised three issues in the brief, but the state agrees that Corey's 95-year sentence should be vacated and a minimum new post-trial and new sentencing proceedings should be held where Corey was denied his right to counsel. We ask that this court go further based on the two errors identified in Issue 1, that this court remand for a new trial, and then only if necessary, post-trial and post-sentencing proceedings. Your Honor, the issue before the jury here is whether Corey was accountable for the conduct of the shooter, Jason Burns. The state's theory was based on two premises. One, that Corey had a gun, fired Burns, taking it from him, shooting into the car and killing the decedent. And two, that Corey himself had previously threatened to shoot people shortly before at the Koalas' home. The Martell prior was the only witness who said he saw Corey with a gun in his waistband. His testimony was improperly bolstered by inadmissible hearsay, that being prior consistent statements, while the assertion that Corey had made a prior threat was not based on facts that were in evidence, but facts not in evidence regarding the prior testimony of Raymond Dart. So based on those issues, which both went to the dispositive issue for the jury, whether Corey shared the criminal intent of the shooter. On the prior threat, your position is that the state just didn't complete the impeachment. They asked him, were you asked this question, and they didn't ask, did you give this answer. That's correct, Your Honor. Could have. No question but that they could have completed that impeachment, but they didn't. The record doesn't demonstrate conclusively that they could have, but we're not arguing that they couldn't have. And the problem is, it was pointed out to them, counsel recommended this. The counsel should then have objected when the state relied on the substance of that alleged prior threat as evidence of Corey's guilt. They told the jury that threat was what makes him legally accountable under our laws. And then they went further and actually alleged that Raymond Darden had told the police about that. That is not in evidence. And they said that Raymond Darden told the grand jury about that. And in fact, that's not correct. The grand jury transcripts of Raymond Darden are in the record, and it's not contained in there. So it's only in Burns' trial. That's correct. And I do think I made a misreference in my reply, called it the grand jury. But so we're clear, the only allegation that Darden ever testified about this was at Burns' trial. And so I apologize for that error if I replied briefly. It's clear that he did not tell this to the grand jury. He wasn't asked. And there's no evidence he told this to the police. So the state's reliance on this was key to his theory of accountability, as well as its claim that Corey had the gun prior to the shooting. And that, again, was based on the testimony of Markel Carter. And he had a deal with the state. He, I don't know if he had. I don't know that he had a deal. I think he did testify. He did have a hanging gun charge, a felony charge hanging over his head. I do think he testified that there had been no promises made by the state. But, of course, he was aware that the state held power over him just because he was charged with this gun crime. Maybe I don't. I don't know if he had a deal. But he also, so he had this hanging gun charge. He was out home monitoring at the time. He had originally at some point refused to testify to this case. And so given an immunity grant, for anything he might say. But the immunity related to a violation of probation for a juvenile charge, correct? Well, he said that the reason. It wasn't the gun charge. It was the juvenile probation violation. His testimony was that that's why he wanted the immunity. Because he didn't want to violate his juvenile probation. But the agreement itself, which I can't quote to you right now, but it is quoted in our briefs. I think it was very broad. It's recorded in my opening brief. But he did say that the reason he wanted it was just because he didn't want to violate juvenile probation. But I'm not so sure we should accept that. Because Markell Carter, he's out, he's had a lot of these proceedings. Just as so many of these other young men were that were in charge. Carter was what the person who may have called got him into the scene. So he was potentially exposed to liability. And the other thing we should remember is he was long-time friends with a co-defendant, Gabriel Anderson. No relation to Corey. But had never met Corey before. And so that's another thing that affects the jury's consideration of his credibility. And so because he wasn't the most credible witness, it was prejudicial for the state to put in numerous, to repeatedly elicit the substance of his prior handwritten statements to police signed by him that were consistent with his testimony. And just because those prior hearsay statements were written out that way, that doesn't bring them within the limited hearsay exception for prior statements of identification. In fact, the statements we make are very similar to the ones this court found erroneous in People v. Randolph. In that case, a police officer testified on direct that he saw the defendant drop an object. His partner picked it up and was later found to be a controlled substance. And then the state admitted his prior consistent statements written in his police report. Just to that effect, I saw the defendant drop an object that was picked up by my partner. In this court, how they, well, that's hearsay. It's not admissible as a part. Prior consistent statements are simply not admissible. And I don't think this court would have come to a different conclusion there if it had been shown that a picture of the defendant was attached to that police report. When you've got a witness identifying more than one person, courts have held that it's okay. It wouldn't mean much to the finder of fact for the witness to say, I picked up that person and I picked up that person. Without saying, if they're both involved, who they were, how they participated. So you're absolutely correct. The witness is allowed to say, I picked up this person. I was a shooter. This person. As a lookout. Yes. And that is actually correct. So how is that different from what? And that did happen here. And what we're challenging is how the state went further. Bringing out the substance of a prior handwritten, signed statement. Putting that handwritten statement up on a screen. Reading it several times to the jury. But if it's admissible as a statement of prior identification, is there any limitation in the statute on how the state can use it? You can't make a demonstrative exhibit and display the statement? So I think we have two statements here. One, we have a statement of Cartersville Police saying, that's the shooter. That's the gun. Okay. That's one statement. That's admissible under the exception. But then we have this other statement. Okay, the police. Write it down. This is the person I know is Lord. That's Corey. I saw a gun in his waistband. That's a narration of the crime. I saw another person take that gun. That's a classic handwritten statement, which under Section 115-10.1, the legislature has determined that prior handwritten statements can come in, but they have to be inconsistent with the witness's testimony. And so I think the limit to the prior statement of identification exception comes from looking at 115-10.1 and the general bar against hearsay in general. So I'm trying to understand the parameters of your argument. You're saying that it's okay if Carter had written on the photograph, this is the person who brought the gun. No, I think I'm saying it's okay if Carter or the police officer he was talking to came in and said, Carter made an oral statement, pointed out, circled Corey and said to me, that was the person that brought the gun. And what difference does it make that he writes it on the photograph? They say to him, okay, this is the guy who brought the gun. Write that on the photograph so we know which one you're identifying. So the difference is, and I think it's shown by how the State used these written statements here, is that it's a signed written statement. It's different. It's just like the memorialized handwritten statement that prosecutors take all the time. And I want to point out how the State used this in closing arguments. They put it up on a screen in an array with the written statement below it. The State told the jury that Markov Carter circled this defendant, Corey Anderson, and he indicated in his own handwriting that this is the person I know as Lord. His name is Oral Sodcom in his waistband. They're focusing on the handwritten nature, the signed nature, as being powerful evidence of truth. And the law recognizes that written statements are more probative than oral statements, and that repeated use of written statements is more probative. And that's why the law honors them. Because the jurors kind of believe that, which they hear and read and hear again. And so, again, Carter was a critical witness because if Corey doesn't have this gun, he looks just like Raymond Darden and Cortez Robinson, a guy there with nothing to do with this. Jason Johns, the shooter, had this gun in his home under his mattress days earlier. He had the gun in his shop for the season, and he had the gun days later. And so we have the conclusion without Carter is that he brought the gun to commit a murder, which he did, and then he left with it. And so Carter's testimony is crucial. And so we have faith in that error, and the error we got out of the arrest threat that this court reversed. And we're now starting the trial. Thank you, Your Honor. Anthony LaCour, counsel, and Matthew Connors on behalf of the people of the state of Illinois. The most important thing to begin this analysis with is a discussion of the fact that defendant has acknowledged that these claims are forfeited. By choosing to persist with forfeited claims, defendant must demonstrate there was prejudice and that there was plain error, depending on the alternate theories of the effective assistance of counsel or through plain error. Turning to the first question as presented by defendant, here we focus this court's attention on the cross-examination or the direct examination of Raymond Darden. And it's important that this court examine the language in the question posed by the prosecutor. Page 91, KKK91 of the brief, defendant refers to the following quote. Do you recall being asked this question in cross-examination and getting this answer? Question. When they were in front of the door, defendant says co-defendant, quote, get out of the way and defend their acts. Answer, yes. Do you remember being asked that question at the prior testimony of June 20th of 2010? To which that Raymond Darden replied, yes. That is a compound question that was repeated throughout the record. Pages 79, 87, 91 through 92. No, but when you get across it, I mean, any impeachment is where you ask the question and did you get the answers. You only ask the first half of it, where you ask the question. No, that's not correct. The same language of the question, again, if I may read. Do you recall being asked this question in cross-examination and getting this answer? There is a point to be made that that's what appears in the transcript. Now, the people can see that the use of purpose began to ask a redundant question afterwards, which was, do you remember being asked that question? Half of the question. Half of the question. Okay. So, again, we have the people can think that it may not have been the best practice, but the question and answer was asked and given. And if there was any dispute, we need to only look at the next page when the prosecutor asked Raymond Darden again. After these threats were made to Tomasz Kowal's mother, where did the whole group of you go? And he said back to McGarry. That follows up nicely with the question of him saying, I acknowledged it. He understood that he acknowledged that there were threats made. It was not just the one threat made by codefendant Gabriel Anderson. It was multiple threats made by codefendant and misdefendant. The record also demonstrates that Darden specifically refused to acknowledge other statements of his testimony. It can point to pages 95, 98, 104, 110, 160, 161. On occasions he specifically said, no, I don't recall. He made clear that, no, there are certain statements I refuse to acknowledge. Certain statements I will. And in this occasion, the prosecutor used that phrase, do you recall being asked this question and this given answer? The people concede, as we didn't agree, that the second compound question only asked half. That was an unqualified yes. There was no ambiguity in the witness's response. The witness didn't limit his response in any way. And that's why the prosecutor argued at the time of the motion for the trial, and that's why the circuit court properly exercised its discretion and said that information did come in. There's no question that information could have come in. In Volume 3 of the record, there was a motion in limine about some of these statements, and if this court looked, there was actually testimony from an assistant state attorney who did start in. The testimony could have been proved up, but it was unnecessary because he acknowledged that statement. And again, this issue is not preserved because it was not in the motion for the trial that was litigated below. So the defendant has to demonstrate that the error was plain. The fact that we're having a conversation about whether or not this was the best phrasing of the question demonstrates that the error is not plain. It's something that requires some sort of interpretation. The defendant has to demonstrate that the error was plain and that he was prejudiced. We can discuss prejudice by saying that this is not the only evidence that links. Well, it would be prejudicial if Durden's statement, say for example, Durden's statement had not been allowed. Then the result would have been different. No, this people's position would still be ample evidence to find this defendant guilty under a theory of accountability. We can go through that evidence. What does it include? It's unrebutted that there was a fight between co-defendant Anderson and Thomas Quagley Xavier Smith. Quagley left, came back to Smith's house with two friends. Co-defendant Anderson then called for help. Raymond Durden came with Cortez Robinson, Jason Burns, and defendants. Marquardt testified, I saw the defendant with his gun. That doesn't change. That statement, I saw the defendant with the gun, is still a testimony. And he's the only one though. Yes. He's the only one. Sorry, Your Honor. But we do have testimony which specifically says Jason Burns did not have a gun that day. Defense counsel pointed out that there was a gun scene previously. Therefore, the impression is he had the gun. That's not what happened. Judge Jasmine Johnson, Burns' girlfriend, specifically said, I was with Jason that day. He didn't have a gun. The only person that was seen that day with the gun was the defendant. So we go back. And credibility had some credibility issues. Yes. Many of these people had credibility issues. We had witnesses who did not want to testify. We had witnesses who in previous hearings attempted to invoke their Fifth Amendment rights. Those are witnesses that the state were given, and they provide ample evidence. And that evidence includes multiple people talking about the defendant going along with the group to Tamara Squall's mother's house after the incident. There was no question the co-defendant threatened the mother during the conversation. We have co-defendant asking for the CAFA, which we know that that means he's asking for the gun. We have testimony that the group of people, including the defendant, went to that house looking for a fight. That's established on KKK's 86 through 88. We saw the defendant reach for the weapon, set up two different occasions. We saw Jason Burns snatch the weapon. That's not consistent with the guy who had the gun with him. We have multiple references to that. There were people. It's unambiguous that Jason Burns committed the shooting. People saw Jason Burns commit the shooting. And then later on, we saw Burns return the gun to the defendant. So there is no question there would have been ample evidence to demonstrate violent design. The use of the term return means that you have to believe that the defendant had the gun in the first place. Yes. There's evidence that Burns gave the gun later to the defendant. Yes. That's believable. But there's still a question mark about whether or not the defendant had it in the first place. To the extent that the court doesn't believe Darden's testimony, there is nothing in the record to demonstrate that Burns had that weapon. Again, this is not a reasonable doubt argument, because if it was, all the evidence provided to the prosecution would say that the testimony saying that Burns did not have a weapon with him prior to the shooting would really forestall any argument that the shooter was armed prior to the incident. Again, this is all done through the guise of either plain error or ineffective assistance of counsel for failing to preserve an evidentiary ruling, because that's what this initially comes to the conversation based upon, is the evidentiary ruling by the circuit court that, in fact, the circuit court properly acknowledged that evidence came in. Turning to the second question, again, we're discussing a forfeited issue, whether or not a statement of identification admitted to pursuant to subsection 115.12 was proper. The people's position, as Justice Mason pointed out, is that it's proper in and of itself to say, this is the person. We had multiple photo arrays on two different days, the same witness being asked to identify multiple people. How does this happen in the investigatory process? It happens by saying, this is Jason Burns, this is the person that I saw shoot the person, and that's what he wrote on that photo. The next day, Markel Carter came back to the station at the worst point in time. He was asked to identify another photo array. He identified this defendant and said, this is the person who I know is Lord, who had the gun prior to the shooting. This is part of the investigatory process. The officers are out there looking for people. You have to tie the relevancy of these people and of the identification to the actual people. Had there just been a picture saying, I identified that guy, that doesn't tie the witness's involvement to the offense. Well, I understand Mr. Cassidy's argument, though. He's saying he concedes that some descriptive language is okay, to say Corey Anderson is the one who brought the gun. He says that's okay. But then he's saying what the state did at trial was take this writing on the photograph, make it a demonstrative exhibit, really reinforce it to the jury, and is there such a thing as overuse of an otherwise admissible statement? He did. This is the defendant's burden on the field when he was choosing to persist with a claim that has been forfeited.  This is not a 10.1 statement of admission of a statement that we have consistently in the other witnesses. This is a statement of identification. It's something in writing? Yes.   hundreds of photographs, hundreds of photographs, hundreds of photographs, I mean, people raise every week. They have circles or X's. The whole time I've been here, I've never seen one with handwriting over the head of somebody. That really struck me as very distinct and very unusual. My guess is that the state thought, ah-hah, we've got something golden here. We can use this. And we did, and we used it effectively. The question for us is whether or not that's not a slippery slope. I mean, what happens when the police department decides, oh, we got away with it, I'm crying. So let's just do this for everybody. Get the photo array witness to start writing on the corners and in the borders and on the pictures and all over the place about what happened and do a narrative statement of what was going on, which is what this was, a narrative statement. There was a statement, and again, the question being posed by the funders. But it wasn't under oath. It was just a statement. She was subject to cross-examination. It was a statement to the police, and the police could just as easily have testified what the identification was, that this is the guy that this witness identified as the guy that brought the gun. They could have done the same thing. They could have, and that could have been a further fodder for cross-examination. See, our question always asks you, what happens in the next case when somebody writes all over the edges and the borders and the margins and tells their whole story and the cops then give that to the state's attorney and then the state's attorney shows that to the jury and they sort of make their case indirectly with, you know, fault markers? So that's predicated upon a number of assumptions. First of all, is that improper? Is it improper to make that initial notation? This court has consistently held that any other notation is fine. We would have the recognition of an X or no person identified. I don't know about my 23 other colleagues, but I've never seen a notation like this. I'm not saying this is a good notation. I'm saying the general one that we've all seen in our careers. We see X's and circles. X's and circles. Those are identifiers. That's fine. That's a demonstrative statement of I identified this person. How do I identify that person? Now, part of the reason this came in was closing argument. Throughout closing argument, defense counsel referred to witnesses as a snitch. I'm sure it was more than closing argument. It's a giant screen with this handwriting on it. It has an evidentiary statement. It's the people's position that that's what was done during the investigatory process. It's before the state was involved. They had this evidence. The parties could have ---- Yes, Your Honor? I'm sorry? So you've got Carter saying on the witness stand, this is the guy that I saw brought the gun. He says that. That's his testimony. That's evidence. The jury hears that. And then you boost that up a notch, maybe ten notches, with this exhibit of a picture that was with handwriting on it that was not under oath, that was in a police station when they were discussing his who knows what, maybe his juvenile case, maybe his involvement in this case. God only knows. And the jury now hears something on the stand, and they see something that's a picture. How is that not wrong? Because in and of itself, 115.12 allows for the admission of a statement. The plain language is the statement is one of identification of a person made after proceeding. That is the plain language of the statute. This is Lord. This is the person that saw the gun. That is a statement of identification. It ties this witness's recollection. That's his testimony under oath in court. No, that was the statement that was written on the receipt. Again, page 9 of the reply brief defended amidst the propriety of this. So now we're talking about this is properly admitted evidence. Now, is it used in aggregate? That's the question that this court wants to say. Was it used in aggregate? Yes, it was. It wasn't used improperly because it goes to this witness's ability to identify, defend in a trial. That was an issue. That's a dependency. Isn't the person I saw with the gun? Defendant's theory of the case is I never had a gun. If there was nothing to tie that gun to defendant, we'd be standing up here with a different argument because he'd say, there's no evidence about this gun. That's not what would happen. We have a witness that they sought to attack and says he didn't have the opportunity to view. It was dark. He didn't see. At one point, they had a conversation about, well, the gun should be safe. They wear baggy pants. They tend to sag down. That's probably what he had on at the time, isn't it? So this isn't something that was put on just in an attempt to make a stronger, more compelling point. It was responsive to the evidence that came in. And, again, this has to come in either through plain error, or it's the defendant's burden to demonstrate under the first point that the evidence is closely balanced. It means the people's position that there's ample evidence that it wasn't, or through ineffective assistance of counsel. What would have been the prejudice in this case if we established that the evidence all leads to the same point, that there was a common design. This group of young men got together, looking for a fight. The defendant came apart, armed for that fight. Everybody was on the same page. There's no question about all of the circumstances. The only question is whether or not the defendant's argument that he wasn't carrying a gun. That's the only point of evidence he can point to on appeal. If there are no further questions, for other reasons posted in the people's brief, we ask you to confirm the convictions and remember post-trial proceedings. Thank you. Thank you, Your Honors. It wasn't the gun that made this case. The allegation that Corey had a gun, that's what makes him different than Darwin, Cortez, Robinson, and the other boys that weren't charged out there. And it was only Markell Carter that saw him with that gun. And I think it's clear now, there aren't any cases so far that have proved such narrative statements on these arrays. And so I do think it's apparent. The case you relied on, Randolph, involved reading off police reports. That's different because here we have a statutory basis for admitting a statement of prior identification. We have. The case is not directly on point, Your Honor. We don't have a case, I don't think, directly on point, that allowed a handwritten, signed narrative statement. So this Court has to decide where that line is, to preserve the rule about inconsistent written statements, but to give the fact of this rule. And I think that line is, I told the police, this is a person who's a shooter, I told the police, this is a person who brought the gun. And the police can testify. I heard them say that. And that's it.  signed written statements just because they're on a photo array before the jury. And when you do, it's prejudicial. And it's one fact where, you know, Josephine Johnson says she didn't see Burns with a gun that day, but she also says she didn't see Corey with a gun that day. So prior to the shooting, she sees Burns with a gun after the shooting. She saw Burns with a gun days before the shooting. Correct me, there were a group of young men. Yes, Your Honor. Burns and Andy Anderson Corey were two of them. Yes, Your Honor. Was anybody asked whether they saw any of the other bunch of kids with guns? No, I don't think anyone other than her saw anyone with a gun. Except the people who all saw Burns shoot into the car. Okay. So, I mean, your theory is it's entirely possible that either Burns had the gun when he got there, or that he got the gun from some other kid, but he didn't get it from Corey. Right. Our theory is, like, the national conclusion without first testimony is he brought the gun because it was his gun, it was under his mattress, and he used it to kill him. All right. Thank you, Your Honor. Thank you. Gentlemen, thank you very much for your arguments and your wonderful briefs. We've enjoyed both, and we will take this case under advice. Thank you.